**BAR RAY PRODUCTS, INC.**

v.

**The UNITED STATES.**

**No. 382–61.**

United States Court of Claims.
Oct. 16, 1964.

Albert Foreman, New York City, for plaintiff. M. Carl Levine, Morgulas & Foreman, New York City, of counsel.

Robert R. Donlan, Kensington, Md., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, and DAVIS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 57(a) to Herbert N. Maletz, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The case proceeded for adjudication on the basis of the administrative record alone without submission of further evidence and such facts as are necessary to decision of the case are found in the commissioner's opinion which was filed on May 19, 1964. No exceptions to the commissioner's opinion were filed by the parties and on July 17, 1964, defendant filed a motion to dismiss for default pursuant to Rule 63, to which plaintiff filed an answer on July 23, 1964, setting forth that plaintiff accepts the report of the commissioner and agrees and consents that judgment be entered in accordance with his findings and recommendations.

Since the court is in agreement with the opinion, findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plain-

tiff is therefore not entitled to recover on its petition, which is dismissed subject to the condition that defendant make tender to plaintiff of all the units in question, as set forth in the opinion, which defendant has in its possession.

In view of this dismissal of the petition, no action is required to be taken on defendant's motion to dismiss filed on July 17, 1964.

## OPINION OF COMMISSIONER

Plaintiff had contracts with the defendant for manufacture and delivery of certain photographic processing tray sets. Several years after the units were delivered and accepted, and payment effected, defendant's contracting officer found that they did not meet specification requirements and that their acceptance had been induced by such gross mistake as to indicate fraud. The contracting officer offered return of the units and demanded refund of the purchase price. Plaintiff took an appeal to the Armed Services Board of Contract Appeals (ASBCA) which was denied. Defendant thereupon again offered to return the units and repeated the demand for refund. When plaintiff refused to refund the purchase price, defendant withheld from it monies due under other Government contracts for which recovery is now sought here.

In view of the holding in United States v. Carlo Bianchi, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963),[1] the problem in this case—as stated by the court— is "to determine, on the basis of the administrative record and the provisions of the contracts, whether the decision of the Board of Contract Appeals meets the standards of Public Law 356, 83d Cong., 2d Sess., 68 Stat. 81, 41 U.S.C. §§ 321–322

(the Wunderlich Act)." Bar Ray Products, Inc. v. United States, Ct.Cl. No. 382–61, decided July 12, 1963, slip op. p. 3.[2] Under that act an administrative determination on a question of fact made under the disputes clause of a Government contract is final and conclusive unless the determination is fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. Against this background, plaintiff has filed a statement in the nature of an assignment of errors challenging certain findings of the ASBCA as not being supported by substantial evidence—a contention which defendant denies. Thus the sole issue is whether or not the findings in question are supported by substantial evidence.[3]

The facts leading up to the present controversy are as follows: Plaintiff, as low bidder, was awarded three contracts on April 9, April 16 and June 17, 1953, for manufacture and delivery of 22 portable field photographic processing tray sets, for a total price of $26,046. Each set was to be a composite unit consisting of a set of three trays, plus elements to provide heat or refrigeration to the solution in the trays. The unit of trays was made of stainless steel and consisted of three open trays arranged side by side and so constructed that by means of plumbing fixtures, water could be circulated through the space immediately beneath the trays. By controlling the temperature of the circulating water, the temperature of the solution in the open trays could be raised and lowered to, and held at, 68° F., which is the commonly accepted temperature for processing photographic products. The heating and refrigeration elements were required to

---

1. The case holds that "the determination of the finality to be attached to a decision on a question arising under a 'disputes' clause (of a Government contract) must rest solely on consideration of the record before the department." (373 U.S. 714, 83 S.Ct. 1413.)

2. The court held that in cases involving latent defects or misrepresentation amounting to fraud, action may be taken under the disputes clause after the contract has been completed, provided such action is taken within a reasonable time after the defects or fraud has been discovered. Id. p. 344.

3. At a pretrial conference the entire administrative record was, without objection, received in evidence.

meet the following performance-type specifications:

"  *   *   * The cooler shall have sufficient capacity to cool the water in the trays from 100 degrees F. to 68 degrees F. in 1½ hours when operating in an ambient temperature of 130 degrees F. and a relative humidity of 15 percent.

"  *   *   * The cooling unit shall become effective when the temperature of the circulating water exceeds 70 degrees F. and shall remain effective until the temperature of 68 degrees F. has been reached. The heating unit shall become effective when the temperature of the circulating water drops below 66 degrees F. and shall remain effective until a temperature of 68 degrees F. has been reached. The design of the thermostatic control shall be such as to prevent simultaneous operation of the heating and cooling units."

Each contract contained inspection clauses which read in part:

" (c)   *   *   * Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.

"(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud."

Each contract also contained the following guarantee clause:

"It is understood that the equipment herein specified shall be guaranteed for a period of one (1) year from date of final acceptance thereof against defective materials, design and workmanship. Upon receipt of notice from the Government of failure of any part during the guarantee period, the affected part or parts shall be replaced promptly by new parts by and at the expense of the contractor."

Shortly after having been awarded the first two contracts for the photographic processing tray sets, plaintiff on April 23, 1953, wrote the contracting officer requesting permission to make certain modifications to the specifications which it said "would be to the Government's advantage without affecting the price per unit." The contracting officer replied that "the severe limitations imposed on the end use of the equipment and its specialized application" would not permit adoption of the suggested changes and requested that "this current procurement be accomplished under the specifications designated."

The 22 units were shipped during the period December 30, 1953 to January 18, 1954; accepted by the defendant's inspector; and paid for. Some 8 months later, defendant made an inspection of one of the units in the course of which it discovered a number of defects in the unit's design and workmanship. For that reason the contracting officer sent plaintiff an unsatisfactory equipment report in September 1954. Plaintiff replied in December 1954, conceding that the units did not meet specifications but adding that it had deviated from the specifications "only after lengthy discussion with (defendant's) personnel and only with their consent and approval." In this connection, the plaintiff indicated that the specifications were in error and that the deviations it had made "were an improvement in performance over what the government would have gotten for their

money if the specifications were and could have been followed."

In January 1955, after another unit was inspected, the contracting officer addressed a letter to the plaintiff in which he "determined that the units are defective in design and workmanship" and made demand under the guarantee clause for correction of specified defects. Plaintiff responded that the demand was unacceptable stating that it had been instructed to build the units "so as to circumvent the specification contradictions"; that "no changes could be given to (it) in writing because the award was on a 'buy against' action";[4] and that it had "built (the) equipment to the intent of (the) specifications and in such a manner as to be suitable to the use intended." In view of plaintiff's refusal to correct the defects, the contracting officer in a letter dated May 2, 1955, made demand under the guarantee clause for $15,185.50—the amount he estimated as the cost of making the corrections. On the same day (May 2, 1955), plaintiff appealed from this decision and requested an oral hearing. This appeal, however, was never forwarded to or docketed by the ASBCA. Instead, further efforts were made to resolve the dispute by agreement. Finally, the contracting officer, on April 4, 1956, issued findings of fact with respect to the demand for $15,-185.50 under the guarantee clause, in which he listed specific defects in design and workmanship and concluded that the contracting officer had never authorized the contractor, either orally or in writing, to deviate from the specifications.

Despite these findings, the parties made a further effort to negotiate settlement of the dispute and for this purpose made arrangements to return one of the units to plaintiff's plant and there subject it to a performance test on August 21, 1956. Before starting the test, however, plaintiff acknowledged that the unit would not operate at an ambient (room) temperature of 130°, as required by the specifications, and proposed instead that the test be conducted in an ambient temperature of 100°, which proposal was carried out. The test readings showed that even in the lowered ambient temperature of 100°, the cooling unit was able to reduce the temperature of the water in the trays from 100° to only 76° rather than the 68° prescribed by the specifications.

Following this, plaintiff offered to correct various deficiencies in the sets provided the defendant accepted their limited performance at the relaxed ambient temperature of 100°. This offer was ultimately rejected. Nevertheless plaintiff continued to seek acceptance of the units for which purpose it made certain modifications in the unit that had been returned to its plant and then conducted performance tests thereon in July 1957. Again the unit failed to meet specification requirements, the test results showing that when operating in an ambient temperature of 100°, the temperature of the water in the trays was reduced from 100° to 73° in 4½ hours, and that when operating in an ambient temperature of 83°, the temperature of the water was reduced from 100° to 68° in 2½ hours.[5]

After further negotiations and exchange of correspondence, the contracting officer on December 27, 1957, issued "Supplemental Findings of Fact" pursuant to the "Inspection" clause of the contracts rather than the "Guarantee" clause.[6] He found, among other things, that "the acceptance of the inspector was induced by such a gross mistake indicative of fraud as not to be binding upon the Contracting Officer." Thereupon he

4. A "buy against" contract is one made necessary because of default by the prior contractor.

5. By contrast, the specifications (quoted supra) prescribed that "[t]he cooler shall have sufficient capacity to cool the water in the trays from 100 degrees F. to 68 degrees F. in 1½ hours when operating in an ambient temperature of 130 degrees F. and a relative humidity of 15 per cent."

6. The contract provisions pursuant to which the findings were made were not specifically identified by the contracting officer.

concluded that the "contractor is obligated to the Government for the purchase price of 22 units ($26,046.00), for which payment has been made, on the grounds that they do not meet the specification requirements."

On January 17, 1958, plaintiff appealed to the ASBCA from the contracting officer's decision of December 27, 1957, and requested that its "appeal be considered in conjunction with (its) appeal dated May 2nd, 1955." The board concluded (after a 2-day hearing) [7] that the evidence supported the contracting officer's decision.[8] It determined that misrepresentations of a former plant manager of the plaintiff led to erroneous acceptance of the units; that no variations from the specifications were authorized by defendant; and that (contrary to plaintiff's contention) it was not persuaded by the evidence that the performance called for was impossible of achievement within the limitation of the specifications.

Against this background, plaintiff contends that findings 8 and 11 of the board and part of its finding 16 are not supported by substantial evidence. These contentions are considered seriatim.

Finding 8 of the ASBCA reads as follows:

"During this period or shortly thereafter representatives of appellant visited the Engineer Research and Development Laboratories at Fort Belvoir, Virginia, and suggested that the specifications should be changed. No change in the specifications was authorized. Its representatives then visited the Office of the Chief of Engineers at Washington, D.C. The evidence before the Board is conflicting concerning the purpose and accomplishments of this visit. Although appellant stated in the letter, dated 9 November 1953, to the contract administrator that 'After lengthy discussion we were advised to make such minor modifications as was necessary to avoid the ambiguity of the specifications,' no such assertion was made by appellant's representative while under oath at the hearing. We conclude that no change in the specifications was authorized by any person having authority to make such a change as a result of these visits." [9]

To place this finding in perspective, it is relevant to observe that the bid invitation for the units in question stated that each bidder "offering tray sets that do not comply in every particular with Specifications cited, shall submit with his bid a detailed statement covering each and every point of non-compliance." Also, paragraph two of the general provisions of plaintiff's contract required that all changes in the specifications or design be in writing, signed by the contracting officer. However, plaintiff never submitted a statement of non-compliance with its bid, nor did it produce at the administrative hearing any written record of a change in the specifications having been authorized. To the contrary, the record shows that plaintiff's request for permission to make modifications in the specifications, contained in a letter of April 23, 1953, was specifically rejected by the contracting officer.

What is more, plaintiff failed to present any oral testimony that a deviation from the specifications had been approved. By contrast, the Government's contract administrator for the early stages of the contract and a succeeding contract administrator both testified that plaintiff's requests for deviations were disap-

---

7. At the outset, plaintiff moved to dismiss on the ground that the board lacked jurisdiction, since the contract was completed and payment made. This motion denied.

8. Since it was of the view that the contracting officer's decision was supported by the evidence, the ASBCA believed it "unnecessary to consider the dispute incident to the rights asserted under the 'Guarantee' Clause."

9. Plaintiff makes no citation to the record to buttress its contention that this finding is unsupported; nor does it indicate in what respect the finding is deficient.

proved, with the latter adding that the plaintiff was so notified; a supervisor at the Engineer Research and Development Laboratories, who represented the Government at the conference at Fort Belvoir with plaintiff's representatives, testified that no deviations were then authorized. He also testified that at the conference he indicated to plaintiff's representatives that his office had no jurisdiction to make changes, this being the responsibility of the contracting officer. That plaintiff was so advised was confirmed by the testimony of plaintiff's vice-president who was a participant in the conference.

In view of these considerations, finding 8 of the board is supported by substantial evidence in the record and is, therefore, final and conclusive under the standards laid down in the Wunderlich Act.

Finding 11, which the plaintiff next claims is not supported by substantial evidence, is, in conjunction with finding 12, the basis for the board's determination that misrepresentations of a former plant manager of plaintiff led to erroneous acceptance of the units. These findings read as follows:

"11. Appellant presented seven units for inspection and acceptance by the Government inspector in December 1953. The inspector noted that the units contained deviations from the specifications. We find on the evidence of record that appellant's then plant manager represented to the Government inspector, contrary to fact, that the deviations had been approved by the contracting officer, and that the Government inspector, who was a chemist and a specialist in drugs and medicines, relied upon this representation as a basis for accepting the units with the deviations noted.

"12. Appellant's then plant manager set up one unit for a performance test to be witnessed by the Government inspector. We find on the evidence of record that the test was

conducted at room temperature using tap water in the trays (Cf. Specification D–3b, Finding No. 2, above), that appellant's then plant manager represented to the Government inspector, contrary to fact, that the test as performed was 'the way it was to be done' under the specification, that the unit so operated lowered the temperature of the water in the trays to 68 degrees F. within 1½ hours, and that the Government inspector relied upon this representation and performance in determining affirmatively that the units met the performance requirements of the specifications."

It is clear, of course, that either of these findings would, if supported by substantial evidence, be sufficient to warrant the board's determination that misrepresentations by plaintiff's former employee led to erroneous acceptance of the units. This being the case, it is significant that plaintiff takes no issue with finding 12, but rather limits its challenge to finding 11. But even were this challenge assumed to be correct, it is difficult to understand how this would advantage plaintiff in view of its failure to take issue with finding 12. In any event, it is apparent that both findings are fully supported by the administrative record, particularly in light of the uncontradicted testimony under oath of Herman R. Burris, the Government's inspector at plaintiff's plant. This testimony established the following: Burris, a chemist and pharmacist by training, was employed by the Navy as an "itinerant" or general inspector specializing in drug, chemical and medical supply procurement; subsequently he was assigned, under an exchange of activities agreement between the Navy and the Corps of Engineers, as an inspector at plaintiff's plant where he spent about a day a week. He accepted the sets in controversy based on his witnessing a performance test at plaintiff's plant of a complete unit, which test was set up by plaintiff's production manager whom Burris knew only by the name of "Dutch". The test

was conducted at room temperature rather than in an ambient temperature of 130° as required by the specifications; also for the test, tap water (reduced to 5 pounds pressure) was used in the trays rather than water heated to 100° in accordance with the specifications. On this basis, the test readings showed that the temperature of the water in the trays reached the prescribed 68° after 1½ hours. The inspector himself was not familiar with the performance specifications but considered that the test was in accordance with the specifications because "Dutch" said "that is the way it was to be done", and he "took ('Dutch's') word for it." For (as the inspector testified) " 'Dutch' would work with (him) all the time" and he found he was able to rely on what "Dutch" said. The administrative record thus leaves no doubt that the inspector accepted the units as meeting performance requirements only because of the misrepresentation by plaintiff's then production manager, i. e., that the test conducted was the appropriate one under the specifications.

■ The testimony of the Government inspector also established that his visual examination of the units disclosed a number of obvious deviations from the specifications but that he nevertheless accepted the units for two reasons; first, because a few days prior to the date of inspection, he had been called to the telephone (while at plaintiff's plant) and someone who said he was from the Engineer Corps stated it would be all right to accept deviations on the contract without indicating what such deviations were; and second, because "Dutch" told him

that the deviations which the inspector noticed and brought to his attention had been approved by the contracting officer.[10] However, it is a reasonable inference from the record that no telephonic approval to accept deviations was given by any representative of the Corps of Engineers; further, the testimony is clear that no deviations from specifications on these contracts had, in fact, been approved by the contracting officer. Fully supported by the administrative record in these circumstances is the board's finding 11 that plaintiff's "then plant manager represented to the Government inspector, contrary to fact, that the deviations had been approved by the contracting officer, and that the Government inspector * * * relied upon this representation as a basis for accepting the units with the deviations noted." [11]

■ Finally plaintiff claims the following quoted portion of finding 16 lacks support in the record:

"The evidence supports a finding that the tests performed on this unit by appellant were the first indication to its management, other than the former plant manager whose misrepresentations led to the erroneous acceptance of the units, that the units would not meet the performance requirements of the specifications."

The uncontradicted testimony of the Government inspector previously discussed fully supports that part of the finding that misrepresentations of plaintiff's former plant manager led to erroneous acceptance of the unit. As to the other aspects of the finding, the record ·

10. Plaintiff relies heavily on Burris' reply to a question by the presiding board member that his acceptance was not based on anything that any "representative" of plaintiff told him. (Tr. 195–96) It is readily apparent from the transcript, however, that the witness did not fully understand the question, particularly the import of the word "representative"; for almost immediately afterward —and on numerous occasions throughout his testimony—Burris stated that he relied upon the representations of "Dutch" in accepting the units. See e. g., Tr. 197–200.

11. In passing it would seem that instead of relying on a representative of the other contracting party, the inspector should have made independent inquiry of his own superior, the contracting officer, to determine whether the deviations had been authorized.

shows that prior to August 21, 1956, when a performance test was conducted in its plant, plaintiff never intimated that it intended to furnish a machine which would not fully meet the performance specifications. On the contrary, in a letter dated August 24, 1953, plaintiff claimed that if the defendant would accept its modifications, the units would provide "mechanical performance far in excess of that contemplated by the specifications." Subsequently, in a letter of May 2, 1956, plaintiff contended that "the equipment as produced by it meets in every respect the operational requirements sought by the Government * * *", and suggested an operational test either at Fort Belvoir or at plaintiff's plant to substantiate this claim. The test thus conducted at plaintiff's plant on August 21, 1956, demonstrated, however, that this contention was not correct—and that the unit fell considerably short of performance specifications. In light of these considerations, there is ample basis for the board's determination that the August 21, 1956 tests "were the first indication to (plaintiff's) management * * * that the units would not meet the performance requirements of the specifications." [12]

■■ In summary, it is evident from the circumstances of this case that acceptance of the units was induced by such gross mistake as to amount to fraud.[13] Thus the Government is not barred from reopening the contract since the Inspection clause provided that final acceptance is not conclusive in case of "fraud or such gross mistakes as amount to fraud." [14] Also, it is conceded that the units failed to meet specifications, and the evidence establishes that no change in the specifications was authorized. The conclusion is thus apparent that the contracting officer was acting within his authority in determining that plaintiff was "obligated to the Government for the purchase price of 22 units ($26,046.00), for which payment has been made * * *."

## CONCLUSIONS OF LAW

Upon the foregoing opinion, which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to re-

12. In view of the fact that plaintiff conceded just prior to the August 21, 1956 test that the unit would not operate at an ambient temperature of 130° as required by the specifications, it might have been more accurate had the finding stated that the August 21 tests "were the first *conclusive* indication to (plaintiff's) management that the units would not meet the performance requirements of the specifications." However, such a modification would be insubstantial.

13. It is apparent from the supplemental findings that when the contracting officer said: " * * * the acceptance of the inspector was induced by such a gross mistake indicative of fraud as not to be binding upon the Contracting Officer, * * *" he had in mind the acceptance provision of the Inspection clause of the contract. Since the contracting officer was aware of the Inspection clause and the facts necessary to overcome the acceptance provision, it must be concluded that he used the proper standard of adjudication in arriving at his decision. See DeBusk v. United States, 132 Ct.Cl. 790, 794 (1955), cert. denied 350 U.S.

988, 76 S.Ct. 474, 100 L.Ed. 854. The fact that, in setting down his decision in writing, the contracting officer used the words "indicative of" rather than "amount to" is of no moment in this case.

14. To establish fraud it is necessary to show a misrepresentation of a material fact, an intent to deceive, and reliance on the misrepresentation by the other party to his detriment. See e. g., United States v. Kiefer, 97 U.S.App.D.C. 101, 228 F.2d 448 (1955), cert. denied 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815; Hackner v. Morgan, 130 F.2d 300 (2d Cir., 1942), cert. denied, Eastman v. Guaranty Trust Co., 317 U.S. 691, 63 S.Ct. 266, 87 L.Ed. 553. It would appear that the purpose of the Inspection clause provision allowing a contract to be reopened after final acceptance not only in the event of fraud but also in the event of "such gross mistakes as amount to fraud" was to obviate the need for proof of intent to deceive, thereby enabling contract reopening on a showing that where the error was so gross, it will be regarded as being equivalent to fraud.

cover and its petition is therefore dismissed subject to the condition that defendant make tender to plaintiff of all the units in question, as set forth in the opinion, which defendant has in its possession.