**KAMINER CONSTRUCTION
CORPORATION**

v.

**The UNITED STATES**

No. 289–72.

United States Court of Claims.

Dec. 19, 1973.

Robert B. Ansley, Jr., Atlanta, Ga., attorney of record, for plaintiff.

Francis H. Clabaugh, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, KASH-IWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

The case before the court arises from a decision adverse to plaintiff by the Corps of Engineers Board of Contract Appeals.[1] Plaintiff, Kaminer Construction Corporation, a corporation organized under the laws of the State of Georgia, seeks relief under sections 1 and 2

of the Wunderlich Act.[2] For the reasons hereinafter set out, we conclude that the decision of the board in this case was correct, that plaintiff's motion for summary judgment must be denied and that defendant's cross-motion for summary judgment must be granted.

On September 26, 1963, plaintiff entered into a contract[3] with the United States Government for construction work at the Marshall Space Flight Center, Huntsville, Alabama. The contract called for, among other things, the erection of a structural steel tower, approximately 154 feet high, and two attached derricks with capacities of 50 and 75 tons. The instant action concerns the collapse of the 50-ton derrick during tests conducted by the Government 9 months after the derrick was accepted by the Government.

Plaintiff subcontracted the erection of the structural steel tower and the two stiff-leg derricks to Industrial Steel Erection Company (now Mississippi Valley Erection Company, Inc). The steel tower and two derricks were completed and inspected by December 1964. Tests of the derricks were conducted by the Government from December 22, 1964 until January 5, 1965. These tests proved successful and the tower and derricks were accepted by the Government on January 5, 1965. General provision 10(f) of the contract mandated that:

\* \* \* acceptance by the Government shall be made as promptly as practicable after completion and inspection of all work required by this contract. Acceptance shall be final and conclusive except as regards latent defects, fraud, or such gross mistakes as may amount to fraud, or as regards the Government's rights under any warranty or guarantee.

The tower and derricks operated satisfactorily for the next 9 months. On October 6, 1965, however, as a result of the

---

1. Kaminer Constr. Corp., ENG BCA 2833, 68–2 BCA ¶ 7321; Supplemental Opinion on Reconsideration, 70–1 BCA ¶ 8257.

2. 41 U.S.C. §§ 321, 322.

3. Contract No. DA–01–076 ENG(NASA)–1086.

collapse of a similar derrick, the Government conducted new road tests on the two derricks. These tests were conducted without plaintiff or its subcontractor being notified. Only representatives of American Hoist & Derrick Company, the supplier of the materials and equipment for the stiff-leg derricks, were notified and were present at the October 6 tests.

The 75-ton derrick successfully completed its load test. When the 50-ton derrick raised a load of 50 tons to a height of 20 feet, however, the stress on the derrick became so great that the eight 1¼-inch high-strength stud bolts, which had been inserted into 1⅜-inch holes [4] in the sill plate and which connected the east-west stiff leg of the derrick to the sill plate of the structural steel tower, pulled loose from their threaded holes in the sill plate. The east-west stiff leg supporting the 50-ton derrick quickly ripped loose from its moorings, went up and out and hit the sway bracing on the tower. The derrick then toppled from its perch and fell to the bottom of the tower structure crushing the north side of the hoist house. In addition to the damage to the derrick, the collapse caused injuries to individuals and extensive damage to the steel tower and adjacent structures.

At a meeting held with plaintiff and its subcontractor on October 8, 1965, all parties agreed that the derrick collapse occurred as a result of the placing of the undersized bolts in the sill plate.

On October 13, 1965, plaintiff was directed by the contracting officer to make the necessary repairs to the tower, derrick and adjacent structures at no additional cost to the Government. The contracting officer concluded that the derrick collapse was covered by section

11, *Derricks,* paragaph 11–28, *Warranty,* of the original contract.[5] Plaintiff performed the repair work under protest, reserving its rights under the contract to an equitable adjustment for performing extra work. Plaintiff's total costs for the extra work amounted to $93,977.82.

Once the repair work was completed, plaintiff submitted a claim for the repair work to the contracting officer contending that the tower and derrick had been finally accepted by the Government and that the Government had received the complete performance which it was entitled to under the contract prior to the time of the derrick collapse. It followed from these assertions that the repair work constituted a change entitling plaintiff to an equitable adjustment.

The contracting officer issued his decision denying plaintiff's claim on December 30, 1966. In the decision, the contracting officer indicated (1) that plaintiff had no right to be notified of the subsequent testing; (2) that the sill plate connection would have been adequate if 1⅜-inch bolts had been placed into the 1⅜-inch threaded holes in the sill plate; (3) that the Government had no responsibility to inspect the integrity of every bolt on the tower and the derrick and that, even if it did, a reasonable Government inspection would not have revealed the bolting deficiency; (4) that the bolts which failed were covered under section 11, *Derricks,* of the contract; (5) that the bolts were "equipment" within the meaning of contract paragraph 11–28, *Warranty;* (6) that the failure was not due to any procedure or manner of installation workmanship; and (7) that even if the section 11–28 warranty provision was not

4. A reading of the east-west tapped sill plate revealed that the eight tapped holes in the sill plate into which the 1¼-inch bolts were inserted had diameters of 1.372″, 1.386″, 1.396″, 1.385″, 1.393″, 1.395″, 1.391″, and 1.391″.

5. "All equipment to be furnished under this section of the specifications shall be warranted for a period of 1 year from the date

of acceptance thereof, either for beneficial use or final acceptance, whichever is earlier, against defective materials, design, workmanship, and improper operation. Upon receipt of notice from the Government of failure of any part of the warranted equipment during the warranty period, new replacement parts shall be furnished and installed promptly by the contractor at no additional cost to the Government."

applicable, the existence of the improperly sized bolts was a *latent* defect which could not have been discovered by a reasonable Government inspection. Plaintiff filed its timely appeal to the contracting officer's decision on January 13, 1967.

At the first trial before the Corps of Engineers BCA, plaintiff and the Government stipulated as follows:

1. The use of 1¼-inch bolts in 1⅜-inch holes caused the failure.

2. The contract required installation of high strength bolts per AISC requirements; and these high strength bolts were, under the contract terms and construction customs, subject to inspection by only a calibrated torque wrench; or during installation they may also be inspected by observing the "turn-of-nut" method.

3. If either method of inspection had been used on the failure joint, use of incorrect bolts would have been discovered as bolts would have stripped out.

4. No inspection by torquing or turn-of-the-nut method of these bolts on the failure joint(s) was conducted by the Government.

5. Final acceptance occurred prior to the failure.

6. Any monetary adjustment, if found due, will be the subject of negotiation by the parties upon remand; this hearing being limited to liability.

The board in its first decision found that the bolts were not part of the "equipment" furnished under section 11, *Derricks*, of the contract and consequently were not covered by the section 11–28 warranty. Construing the stipulation, the board determined that "the undersized bolts were not a *latent* defect within the meaning of General Provision 10(f)." (Emphasis supplied.) Kaminer Constr. Corp., ENG BCA 2833, 68–2 BCA ¶ 7321, p. 34,050.

In reaching its decision adverse to plaintiff, however, the board decided the case on an issue which had not been tried by the parties. The board found:

* * * that the accumulative effect of the mistakes attributed to the appellant [such as (a) inserting the wrong sized bolts, (b) failing to tighten the bolts as required, and (c) failing to maintain an adequate contractor inspection system] is such as to legally amount to "such gross mistakes as may amount to fraud." We therefore find that the final inspection and acceptance on 5 January 1965 was not final and conclusive so as to extinguish the Government's right to require correction of the nonspecification work. [68–2 BCA at 34,052.]

Plaintiff immediately filed a motion for reconsideration arguing that the decision was (1) not supported by substantial evidence, (2) was violative of the stipulations of the parties, (3) included factual matters not litigated by the parties, and (4) was contrary to the law and facts adduced at trial.

The board granted the motion for reconsideration on March 19, 1969. The board order recognized an apparent injustice dealt to plaintiff by the first board decision:

Appellant has moved that we reconsider our decision of 17 October 1968. We have reviewed that decision and are of the opinion that it is correct on the basis of the record we had before us. In our review of the matter, however, it has come to our attention that, because of the way the case developed, the parties have not really tried the issue upon which our decision was based. We have come to the conclusion that fairness dictates that the record be reopened so that they may do so.

Accordingly, it is ordered:

That the appeal be restored to our docket and the record reopened. [Kaminer Constr. Corp., ENG BCA 2833, Order on Motion for Reconsideration, March 19, 1969.]

Thereafter, on May 5, 1969, the board issued a notice of hearing to commence

on July 15, 1969. The notice stated in pertinent part:

> The current status of the case is as follows:
>
> (1) Evidence will be received on all issues—"gross mistake," "latent defect" and "warranty";
>
> (2) Previous stipulations by the parties will be disregarded; and
>
> (3) Testimony adduced and exhibits introduced at the earlier hearing are to be considered part of the record.
>
> If you consider that any other matter requires clarification, please so indicate at this time so that there will be no misunderstandings when the hearing is reconvened.

The board issued its supplemental opinion on reconsideration on April 17, 1970. In the opinion, the board qualified its original ruling adverse to plaintiff and decided the case on the basis of the existence of a latent defect. The board stated:

> Although we are not completely convinced that our original findings and the legal conclusion thereon are in error, the additional evidence received at the rehearing introduces some doubts as to the application of the gross mistakes clause to the facts now before us. On the present amplified record it is our opinion that the case now resolves itself into one of whether or not the use of undersized bolts in the connection between the sill plates and the tower plates was a latent defect.
>
> We now find that the use of undersized bolts in the sill plate connection was a latent defect such as to negate the finality of the acceptance of the work as of 5 January 1965. [70–1 BCA at 38,385.]

Plaintiff's subsequent motion for rehearing was denied and it filed its petition in this court on July 13, 1972.

In contending that it is entitled to relief under Wunderlich Act standards, 41 U.S.C. §§ 321, 322, plaintiff has presented two basic arguments to this court: (1) that there was no latent defect such as to negate the finality of the Government's January 5, 1965 acceptance of the tower and derricks, and (2) that the board was unwarranted in disregarding the stipulations of the parties for purposes of the July 15, 1969 hearing on reconsideration.

### I. *The Latent Defect*

■ Plaintiff contests the board's conclusion that the presence of the undersized bolts constituted a latent defect such as to negate the finality of the Government's January 5, 1965 acceptance of the tower and derricks. By common definition, a latent defect is one which cannot be discovered by observation or inspection made with ordinary care. Black's Law Dictionary 1026 (4th ed. 1968).

This court must apply Wunderlich Act standards to the determinations of boards of contract appeals. Judicial reversals of board decisions are limited to those instances where board factual determinations are found to be fraudulent, capricious, arbitrary, or so grossly erroneous as to amount to fraud, or are not supported by substantial evidence. 41 U.S.C. § 321; United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); Koppers Co. v. United States, 405 F.2d 554, 556–559, 186 Ct.Cl. 142, 147–151 (1968); River Constr. Corp. v. United States, 159 Ct.Cl. 254 (1962). It is only with regard to a determination of a matter of law that this court is not bound by a prior board decision and is free to reach its own conclusion. 41 U.S.C. § 322; Utah Constr. & Mining Co. v. United States, 384 U.S. 394, 86 S.Ct. 1545, 16 L. Ed.2d 642 (1966); Northwestern Indus. Piping, Inc. v. United States, 467 F.2d 1308, 199 Ct.Cl. 540 (1972); Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968); Bruno N.Y. Indus. Corp. v. United States, 342 F.2d 75, 169 Ct.Cl. 999 (1965); Kings Electronics Co. v. United States, 341 F. 2d 632, 169 Ct.Cl. 433 (1965).

In the instant case the board determined that the existence of the undersized bolts constituted a latent defect which could not have been discovered by a reasonable Government inspection. Such a factual determination can only be overturned by this court upon a showing that the board failed to satisfy Wunderlich Act standards in reaching its decision. In a case quite similar to the instant action, Bar Ray Products, Inc. v. United States, 340 F.2d 343, 345, 167 Ct.Cl. 839, 841 (1964), this court held that a board determination that the Government had been induced to accept certain photographic processing trays "by such gross mistake as to indicate fraud," was a factual determination which had to be reviewed under Wunderlich Act standards. In an earlier decision in *Bar Ray*, this court equated a "misrepresentation amounting to fraud" to a "latent defect" and held that actions for such deficiencies could be taken under the disputes clause even after the contract had been completed, providing that the action was taken within a reasonable time. Bar Ray Products, Inc. v. United States, 162 Ct.Cl. 836 (1963).[6]

Plaintiff contends that the undersized bolts were not hidden from sight and could have been discovered by the Government through the exercise of reasonable care and customary inspection methods. The court cannot agree with this contention and the board did not. The record indicates that there were 11,967 bolts on the tower and derrick.[7] The Government had only one inspector present while the plaintiff had a work crew of approximately 60 men. Reason dictates that it was simply impossible for the Government inspector to check every bold or oversee the work of each of plaintiff's 60 employees. The

board had this to say about the bolts in its final decision:

> The head of a 1¼-inch bolt (the width across the flats) is 3/16 inch less that the width of a 1⅜-inch bolt. This difference is readily discoverable when measured with a ruler. However, it is not so prominent that an observer not cognizant of the possibility of a substitution of a smaller bolt for the larger would be alerted by a visual inspection to make the ruler measurement. Bearing in mind that there are thousands of bolts in the tower and derricks and that the mismatched bolts were placed in a position which was particularly awkward for access and observation we find that the presence of undersized bolts in a connection would not be detected by a reasonable visual inspection, such as we have already found was contemplated or required under the contract terms and the referenced AISC specifications.

Plaintiff, however, argues that the decision rendered after the board's first hearing sheds some light on this question. In that decision the board concluded that—

> The record is clear that the Government inspectors were not present at the time the bolts were placed in the connections which failed and thereafter did not test their connections with a torque wrench to ascertain whether or not these particular connections were properly stressed as required by the referenced AISC specification. * * *. [68–2 BCA at 34,050.]

Plaintiff contends that the contract and American Institute of Steel Construction (AISC) specifications (incorporated into the contract by reference in the technical provisions, section 7–02)

---

6. Both *Bar Ray* and the present case contained clauses making final acceptance conclusive "except as regards latent defects, fraud, or such gross mistakes as [may] amount to fraud." Bar Ray Products, Inc. v. United States, 340 F.2d 343, 346, 167 Ct. Cl. 839, 843 (1964); contract No. DA–01–076–ENG(NASA)–1086, Gen.Prov. 10(f).

7. Plaintiff's Supplemental Brief on Motion for Reconsideration, ENG BCA 2833, p. 2, filed Jan. 15, 1969. The Government's brief filed March 7, 1973, accepts this figure as correct.

"required" the Government to inspect the bolts in question. The court cannot agree with this misreading of the specifications.

Section 7–06, *Inspection and Tests*, of the contract specifications is as follows:

The material to be furnished shall be subject to inspection and tests in the mill, shop, and field by Government inspectors. Inspection and tests will be conducted without expense to the Contractor. However, inspection in the mill or shop will not relieve the Contractor of the responsibility to furnish satisfactory materials. When materials and workmanship do not conform to the specification requirements, the Government reserves the right to reject material or workmanship, or both, at any time before final acceptance of the structure.

Just because the material was to "be subject to inspection and tests" and such tests would "be conducted without expense to the Contractor" did not impose upon the Government the duty to conduct all-inclusive tests. The right to inspect does not imply a duty to inspect. What section 7–06 did was to outline the Government's right to conduct reasonable inspections at its own expense at various times and places in the construction cycle. It did not place any duty on the Government to conduct such tests at the risk of assuming responsibility for any deficiencies which it might have discovered.

Section 7–06 is very similar to general provision 10(a) of the contract. That provision states that—

* * * inspection and test by the Government of material and workmanship required by this contract shall be made at reasonable times and at the site of the work, unless the Contracting Officer determines that such inspection or test of material * * * shall be made at the place of production, manufacture, or shipment of such material. * * *.

The general provision, like section 7–06, fails to define the extent or nature of the inspections or tests to be performed by the Government. Without such a definition, this court can only conclude that this provision and section 7–06 were meant merely to outline the Government's right to inspect and did not impose upon the Government a duty to inspect.

Plaintiff would read AISC specification 6(b) with section 7–06 and general provision 10(a) in an effort to impose a duty to inspect upon the Government. Paragraph 6(b), "The Inspector shall *observe* the installation and tightening of bolts to determine that the selected tightening procedure is properly used and shall determine that all bolts are tightened * * *" [emphasis supplied], contemplates only a visual inspection of the bolt tightening process. This interpretation seems proper in light of the language of section 6(c) of the AISC specifications:

When there is need for more inspection of bolt tightness than that provided in paragraph 6(b), the following arbitration inspection shall be used unless a more extensive or different procedure is specified in the inquiry and order for the work:

1. The Inspector shall use an *inspecting wrench* which may be either a torque wrench or a power wrench * * *.

2. Three bolts of the same grade, size [footnote omitted] and condition as those under inspection shall be placed individually in a calibration device capable of indicating bolt tension.

* * * * * *

5. Bolts represented by the sample prescribed in paragraph 6(c)(2) which have been tightened in the structure shall be inspected by applying, in the tightening direction, the *inspecting wrench* and its *job inspecting torque* to 10% of the bolts, but not less than two bolts, selected at random in each connection. * * *.

[Emphasis in original.]

It seems clear from the context that the section 6(c) inspection procedures were

designed for tests required by special circumstances or conditions. Such testing might have been required in October 1965 after deficiencies had been reported regarding structures similar to the tower and derrick here in question. However, such testing was not required during the original inspection period ending on January 5, 1965, since at that time neither party was on notice of any special circumstance or potential defect relating to the construction. Torque wrench inspection sufficient to have discovered the presence of the undersized bolts, at least by AISC standards, hardly seems to have been so normal or reasonable as plaintiff contends it was. In addition, though section 7–02 of the contract indicates that the AISC requirements are incorporated by reference into the terms of the contract, this incorporation has little meaning absent a definition of the extent of the Government's inspection duties.

In its analysis of the Government's purported inspection duty, plaintiff completely ignores the contract clause referencing its own inspection obligation. General provision 22, Contractor Inspector System, required plaintiff to—

> * * * (i) maintain an adequate inspection system *and perform such inspections as will assure that the work performed under the contract conforms to contract requirements,* and (ii) maintain and make available to the Government adequate records of such inspections. [Emphasis supplied.]

▮ Plaintiff had the primary duty to insure that the "work performed under the contract [conformed] to contract requirements." This duty emanated from language considerably more specific than that referencing the Government's right to inspect. Only the failure of the Government to discover an obvious error in construction would have relieved plaintiff of its responsibility to insure that the tower and derricks were properly constructed. As we have already noted, the deficiency regarding 16 bolts in the 11,967-bolt structure was hardly an obvious discrepancy.

In addition, AISC specification 5(a) required that—

> Each fastener shall be tightened to provide, when all fasteners in the joint are tight, at least the minimum bolt tension shown in Table 3 for the size and grade of fastener used. [Table omitted.]

> Threaded bolts shall be tightened with properly calibrated wrenches or by the turn-of-nut method. * * *.

Plaintiff had an obligation to conform with these specifications. Had it done so, the inference is clear from the record that the use of the undersized bolts would have been discovered. In arguing that the Government's failure to employ either the "torque" or the "turn-of-nut" method of inspection caused the bolting deficiency to go unnoticed, plaintiff in fact admits that if either method had been employed the deficiency would have been discovered.

For these reasons, the court concludes that the board decision that the presence of the undersized bolts constituted a latent defect such as to negate the finality of the Government's January 5, 1965 acceptance of the tower and derricks is supported by substantial evidence and is not arbitrary, capricious or so grossly erroneous as to amount to fraud.

## II. *The Stipulations*

Plaintiff contends that when the board agreed to reconsider this case, it did so only to hear evidence on the issue of whether there occurred "such gross mistakes as may amount to fraud" in the construction, inspection and acceptance of the tower and derricks. It argues that the stipulations entered into between the parties during the first board hearing were thereafter binding on both the parties and the board. The

board, however, informed plaintiff in its May 5, 1965 notice of hearing that for purposes of the rehearing "[p]revious stipulations by the parties will be disregarded." Plaintiff asserts that the board was without authority to issue such an order and that the order was contrary to the board's March 19, 1969 order on motion for reconsideration which has heretofore been quoted. Plaintiff contends that the plain meaning of the March 19 order was that the board would hear evidence only on the question of whether there existed "such mistakes as may amount to fraud." Plaintiff alleges that if the board had not departed from the stipulations no finding of the existence of a latent defect would have been possible.

■ In ordinary circumstances and absent special considerations, where a stipulation is entered into before a board and this court is called upon to review the board decision, great weight will be given to the stipulation. Bates v. United States, 450 F.2d 886, 196 Ct. Cl. 362 (1971); John McShain, Inc. v. United States, 375 F.2d 829, 179 Ct.Cl. 632 (1967); Bruno N. Y. Indus. Corp. v. United States, 342 F.2d 75, 79, 169 Ct.Cl. 999, 1007, (1965); Garner v. United States, 161 Ct.Cl. 73, 75 (1963). In instances where a stipulation is inadvertent,[8] contrary to law,[9] contrary to fact,[10] or made without proper authority[11] this court may disregard the stipulation. Though stipulations here were entered into by the parties during the first board hearing, subsequent events led the board to conduct a complete de

novo hearing on reconsideration. It is the decision reached by the board as a result of that hearing which this court has the responsibility to review.

■ The primary duty of this court in reviewing a decision of a board of contract appeals is to determine whether or not the board decision is supported by substantial evidence and otherwise conforms to the standards set out in the Wunderlich Act. This inquiry does not go to the absolute correctness of the appeals board decision. Even if the court believes that it would reach a different decision in a de novo hearing, it cannot reach such a conclusion unless plaintiff is able to persuade the court that the board decision does not satisfy Wunderlich Act standards. See T. C. Bateson Constr. Co. v. United States, 149 Ct.Cl. 514, 518 (1960); see also Allied Contractors, Inc. v. United States, 176 Ct.Cl. 1095, 1098–1099 (1966); Carlo Bianchi & Co. v. United States, 167 Ct.Cl. 364, 368 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965); River Constr. Corp. v. United States, 159 Ct.Cl. 254, 261 (1962).

■ In the instant appeal, the board reached its decision following a complete de novo hearing, as required by the disputes clause (general provision 6(a), contract No. DA–01–076–ENG (NASA)–1086). While this court is not unmindful of the stipulations entered into by the parties before the first board hearing, it is our conclusion that the board decision to conduct a complete de novo hearing on reconsideration cures any

8. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 444, 22 S.Ct. 698, 46 L.Ed. 968 (1902).

9. Sac & Fox Tribe v. United States, 315 F. 2d 896, 900–901, 161 Ct.Cl. 189, 198, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed. 2d 165 (1963).

10. Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917);

Northbridge Electronics, Inc. v. United States, 444 F.2d 1124, 1130–1131, 195 Ct.Cl. 453, 464–465 (1971); H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115 (1965).

11. Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 194 Ct.Cl. 574 (1971).

prejudice which might have resulted to plaintiff from the fact that the stipulations had no effect on rehearing. We reach this conclusion for two reasons. In the first place, the disputes clause only guaranteed to plaintiff that an appeal taken from the decision of a contracting officer would be granted a complete de novo hearing by a board of contract appeals. Plaintiff's appeal received such consideration.

Secondly, stipulations (2) and (3), upon which plaintiff bases its contention that the parties stipulated that no latent defect existed, indicated that the high strength bolts were subject to inspection only by the "torque" or "turn-of-nut" methods and that if either of the two methods had been employed the use of the undersized bolts would have been discovered. In its opinion following the hearing on reconsideration, the board found, as a matter of law, that the Government was only obliged to conduct a visual inspection of the bolts and was not required to employ the "torque" or "turn-of-nut" method. The board further determined that the presence of the undersized bolts would not have been discovered by a "reasonable visual inspection" conducted by the Government. 70–1 BCA at 38,386. While this court is certainly not bound to follow board legal determinations, a review of the board's supplemental opinion on reconsideration has convinced the court that the board was correct in concluding that the Government only had a duty to conduct a visual inspection of the tower and derricks. It necessarily follows from this analysis that stipulation (2) is contrary to law and the court is not bound thereby. *See* Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 37 S. Ct. 287, 61 L.Ed. 722 (1917); Sac & Fox Tribe v. United States, 315 F.2d 896, 900–901, 161 Ct.Cl. 189, 198, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L. Ed.2d 165 (1963).

The plaintiff's motion for summary judgment is denied. The defendant's cross-motion for summary judgment is granted and the petition is dismissed.