NOTE:  Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

04-1327

BENDER GMBH,

Appellant,

v.

Francis J. Harvey,  SECRETARY OF THE ARMY,

Appellee.

_____

DECIDED:  March 21, 2005

_____

Before NEWMAN, BRYSON, and PROST, Circuit Judges.

PER CURIAM.

Bender GmbH appeals the decision of the Armed Services Board of Contract Appeals, Docket No. 04-1327, denying Bender's request for payment of its final invoice under its contract with the Department of the Army and upholding the Army's claim requiring Bender to refund an overpayment.  We affirm.

I

In 1995 the Army awarded Bender a lump-sum fixed-price contract in the amount of DM187,246.57 to clean and close a sewage treatment plant in Babenhausen, Germany, including removing water and sludge from several tanks at the plant.  In the

course of performing the contract, Bender pumped water from the tanks onto a field, in violation of a contract term requiring Bender to haul the water away. An Army inspector reported the incident to local authorities and authorized Bender to send sludge samples from the tanks to be tested for contamination. The testing disclosed that the sludge was contaminated with heavy metals. Bender had performed 90 percent of the contract work at that point and had invoiced the Army for a corresponding amount of the contract price.

After it was discovered that the sludge was contaminated, Bender sent a proposal to the Army offering to dry and remove the contaminated sludge. Some months later, Bender followed up with a letter proposing to remove 120 cubic meters of contaminated material at a cost of DM739.40 per cubic meter. Bender's first proposal to the Army to remove the contaminated sludge contained three line items. The first line item consisted of a charge for drying the sludge, while the second and third line items consisted of charges for loading and hauling away the sludge. Bender's follow-up letter to the Army referred to the previous proposal, but contained only one line item for removing the contaminated sludge and did not break down the costs for drying, loading, and hauling into separate line items.

The Army issued a contract modification in response to Bender's proposal and follow-up letter. Among other changes, the modification increased the price of the contract by DM88,728 for the removal of 120 cubic meters of sludge at DM739.40 per cubic meter. Shortly thereafter, Bender requested another contract modification increasing the quantity of contaminated material to be removed to 270 cubic meters at DM739.40 per cubic meter. The Army modified the contract to reflect the increased

quantity in that request and made another modification in response to a further request to increase the amount to be removed, bringing the total to 430 cubic meters at DM739.40 per cubic meter. The modifications added two clauses to the contract that are pertinent to this case. Clause (b) provided that "[t]he additional quantity will be funded and definitized based on the price proposal and disposal certificates provided by the contractor." Clause (d) provided that "[f]inal price determination of subject contract and modification will be subject to the GPCO [German Price Control Office] audit."

Bender contracted with a subcontractor to remove the water and sludge at a price of DM260 per metric ton. The evidence showed that in the industry, a metric ton is regarded as the equivalent of a cubic meter of material. To facilitate pumping the sludge out of the tanks at the sewage plant, the subcontractor first added water and then mixed it with the sludge to soften it so that it could be pumped out of the tank. The subcontractor then pumped the mixture into compression chambers that squeezed the water out of the sludge. The subcontractor loaded the compressed sludge into containers and transported it to the disposal site where each container was weighed before and after it was unloaded. The disposal site weight slips showed that the subcontractor disposed of 229.12 tons of sludge, and the subcontractor invoiced Bender for removing that amount. When the sludge removal was complete, the Army inspected the sewage treatment facility and issued a Completion and Acceptance Certificate for the work.

During the contract modification period, Bender periodically invoiced the Army for the sludge removal, and on each invoice the Army stamped its standard certification that "services mentioned have been received and work performed is satisfactory and in

conformance to the condition of this contract." The Army paid those invoices before receiving the disposal certificates required by clause (b) of the contract modification. Bender submitted its final invoice after all of the sludge was removed. The contracting officer, however, returned that final invoice, stating that the price audit had not been performed and that Bender had not provided the required disposal certificates. Bender then submitted the weight slips issued by the disposal facility, which showed that a total of 229.12 metric tons of material had been removed.

After receiving the weight slips, the Army ordered an audit, as provided for by clause (d) of the modified contract. The GPCO then requested information from Bender so that it could perform the audit to determine the proper amount to be paid for removing the sludge. Bender refused to supply the requested information because it contended the contract was a construction contract and therefore was exempt from audit on that ground. Bender subsequently argued that the contract was a fixed-price contract and therefore was exempt from audit on that basis. After several months, the Army withdrew its request for a price audit, because Bender would not cooperate with the GPCO. Shortly thereafter, Bender demanded the remaining amount due on the contract. The Army responded that Bender owed it money because Bender had disposed of 267 cubic meters of water by dumping it into the local sewer rather than by hauling it away. The contracting officer issued a decision on that matter, determining that the amount owed by Bender was DM11,869.37 more than the unpaid amount due on the contract. Bender filed an appeal of that decision with the Board.

Two months later, the contracting officer withdrew his first decision and advised Bender that a second decision would be forthcoming. At that time, the contracting

officer also requested that Bender provide the disposal certificates required by clause (b) of the contract modification. Bender provided the weight slips it had given previously, indicating that its subcontractor had disposed of 229.12 metric tons of sludge. Consequently, the contracting officer issued a revised final decision asserting that Bender had overcharged the Army for 200.88 cubic meters of sludge that it did not remove. Based on that finding, the contracting officer concluded that Bender owed the Army a total of DM120,798.10. Bender filed an appeal of the revised decision. The Board affirmed the decision of the contracting officer, and this appeal followed.

## II

Bender contends that the Board erred in three respects. First, Bender argues that the Board incorrectly found that when the parties modified the contract to include the price of removing the contaminated sludge, they changed it from a lump-sum fixed-price contract to one based on unit pricing. Second, Bender claims that the Board erred in determining that the quantity of sludge removed was based on the weight of compressed sludge as opposed to the weight of uncompressed sludge. Finally, Bender insists that in either case, the Army's claim is barred because the warranty period had expired and because the Army placed a "work completed" stamp on each invoice.

## A

The Board found that under the contract modifications Bender was to be paid a fixed unit price of DM739.40 per cubic meter of sludge removed, as indicated by the quantity shown on the disposal certificates. Bender contends that the contract modification was for a fixed price, and that it was entitled to be paid the amount due for removing 430 cubic meters of sludge, regardless of the amount that it actually removed.

In its brief, Bender acknowledges that "[f]irm-fixed price contracts 'may be priced . . . on a unit-price basis.'" Bender proposed, and the Army accepted, a fixed unit price of DM739.40 per cubic meter, subject to a price audit by the GPCO. Evidence before the Board indicates that Bender understood and intended that the contract proceeds would be paid on a unit-price basis.

Under the original fixed-price contract, Bender was responsible for removing the entire quantity of sludge at the original contract price. After receiving the initial contract modification due to the contaminated sludge, Bender asked for three additional modifications to increase the volume of sludge it was removing. In each instance, the price was quoted as being based on a per ton rate for removal. Those requests thus indicate that Bender understood that the contract modifications were subject to per-unit pricing.

Bender argues that the total amount due on the contract ceased to be contestable once the Army waived the GPCO audit. Bender notes that the Board of Contract Appeals found that once the Army waived the audit, it accepted Bender's pricing per unit of DM739.40 as a fair price for the work performed. Bender's reliance on the Board's ruling, however, is misplaced. As the Board made clear, the Army waived its right to challenge the unit price for the sludge removal when it waived the audit, but that did not mean that the Army lost its right to contend that payment under the contract should be based on the amount of material that was actually removed.

Bender next argues that the Army's deletion of the Variation in Estimated Quantities ("VEQ") clause in the original contract supports its position that the disposal certificates were not required to prove how much sludge it removed. The VEQ clause

04-1327                                            6

allows for an equitable adjustment in the contract price if a particular quantity ends up being 15 percent above or below the amount estimated in the contract upon demand of either party. Bender is correct that by removing the VEQ clause in the original contract, the Army notified Bender that there could be more or less sludge than estimated that Bender would have the responsibility to remove at no additional charge over the original fixed price. The removal of that clause from the original contract, however, is not related to the requirement that the disposal certificates be provided to the Army and serve as the basis for pricing under the contract modifications.

Bender argues that "the only purpose of the certificate requirement was to prove Bender dumped the sludge properly." We disagree. Clause (b) stated that the additional quantity referred to in the modifications "will be funded and definitized based on the price proposal and disposal certificates provided by the contractor." Despite Bender's argument to the contrary, we uphold the Board's conclusion that clause (b) indicates that the parties intended to use the certificates of disposal to ascertain the quantity of material removed for pricing purposes. Accordingly, we conclude that the Board correctly determined that the modifications were based on a fixed-unit price for the quantity as verified by the disposal certificates.

B

The Board found that the pricing for the contract modifications was based on the volume of compressed sludge that was removed. Bender challenges that finding and contends that the price was based on the volume of the water and sludge before compression. Because the sludge was dried before its removal, Bender argues that the weight on the disposal certificates represents only 35 percent of the total weight of the

uncompressed sludge that it processed and that it should be paid for. Bender thus contends that the contract's reference to "sludge" should be interpreted to mean "uncompressed sludge."

The Board noted that the modifications to the contract were based on Bender's September 17, 1996, proposal, which clarified its April 26, 1996, proposal. That proposal, in turn, explicitly referred to dried sludge as the material to be removed. Moreover, the weight slips on which the contract pricing was to be based referred to the amounts of dried or compressed sludge that were removed. Furthermore, Bender's September letter stated that the quantity of water and sludge in the tanks was 731 cubic meters. If Bender had intended its price to be based on the quantity of water and sludge together, it would have referred to 731 cubic meters as the quantity it proposed to remove, rather than 120 cubic meters. Accordingly, we uphold the Board's conclusion that the modifications were based on the quantity of compressed sludge.

C

The Board ruled that the Army properly revoked its final acceptance of contract performance because Bender made "gross mistakes amounting to fraud" by invoicing for 430 cubic meters of sludge disposal when it had disposed of only 229.12 metric tons of sludge. In order to establish that it was entitled to revoke its final acceptance, the Army had the burden of proving that it relied on a misrepresentation of fact known to or wantonly disregarded by Bender that caused the Army injury. See Bar Ray Prods., Inc. v. United States, 167 Ct. Cl. 839, 851 n.14 (1964).

Bender first argues that the Board erred in finding a misrepresentation based on Bender's placement of stamps stating "Measurements are Correct" on its invoices to the

Army. It is true that the Board incorrectly found that Bender placed the stamps on the invoices, but that error was harmless, because the Board separately found that Bender had invoiced the Army for 430 cubic meters of sludge when it knew that amount was incorrect in light of its subcontractor's final invoice for disposing of 229.12 metric tons.

Bender next argues that the "Measurements are Correct" stamps that the Army placed on the invoices prove that Bender did not induce the Army to rely on its misrepresentation. The Board found, however, that the stamps were not proof of the amount disposed of, and in fact they show that the Army relied on Bender's misrepresentation as to the amount of sludge removed from the tanks.

Bender further contends that the Army should not be permitted to revoke its acceptance of the contract performance long after the contract was completed. The Board acknowledged that "[r]evocation of acceptance must be done within a reasonable time," but it rejected Bender's argument that revocation of acceptance was impermissible in this case. Bender argues that the delay of more than two years from the date of final acceptance to the date of the contracting officer's final decision was unreasonable. Bender relies on the Board's decisions in Ordnance Parts & Engineering, Co., 90-3 B.C.A. (CCH) ¶ 23,141 (1990), Utley-James, Inc. 88-1 B.C.A. (CCH) ¶ 20,518 (1987). Those cases are distinguishable from this case, however. In Ordnance Parts, the Army knew that a part had failed immediately after the two-year acceptance period, but it waited more than two more years to take any action, including notifying the contractor. 90-3 B.C.A., at 116,186. The Board held that the contractor should not have to bear the burden of the government's delay under those circumstances. Id. In Utley, the contracting officer initiated only two insignificant

actions to correct an issue in a two-year period, and the Board found in that case that the government's delay was unreasonable because it took too little action during the two-year period. 88-1 B.C.A., at 103,726. In the present case, Bender was on notice from shortly after the work was completed until the contracting officer's final order that the Army believed Bender had not fully complied with the contract. Furthermore, the Army actively pursued its claim against Bender during that two-year period. The Certificate of Acceptance was issued in February of 1997, fully two months before Bender issued the final invoice to which the Army objected. The Army requested the disposal certificates after rejecting the final invoice and ordered the audit as allowed by the contract modifications. Over the next six months, the GPCO tried to obtain the information it needed from Bender to perform the audit. When the GPCO concluded that Bender would not cooperate, the GPCO asked the Army how it should proceed. In January 1998, the Army withdrew the audit request. In March 1998, Bender asked to be paid the remaining amount due on the contract in light of the withdrawal of the audit request. In September 1998, the Army responded to a demand from Bender's attorney by requesting repayment of the overpayments the Army made to Bender. In January 1999, the contracting officer issued a decision, which he subsequently withdrew, requesting that Bender supply disposal certificates for the amount of sludge in its invoice. In May 1999 the contracting officer issued a final decision that Bender had been overpaid for 200.88 cubic meters of sludge. Based on this sequence of events, we reject Bender's argument that the Army's conduct reflected unreasonable delay, and we uphold the Board's conclusion that the Army was entitled to revoke its final acceptance in order to recover its overpayment to Bender.