UNITED TECHNOLOGIES CORPORA-
TION, SIKORSKY AIRCRAFT DI-
VISION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 401–89C.

United States Court of Federal Claims.

Dec. 18, 1992.

W. Jay DeVecchio, Washington, DC, for plaintiff. Joan H. Moosally and W. Stanfield Johnson, of counsel.

Anthony H. Anikeeff, Washington, DC, with whom was Sharon Y. Eubanks, Asst. Director, David M. Cohen, Director, U.S. Dept. of Justice, Civ. Div., Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen., for defendant. Major David

Carey, U.S. Army, Washington, DC and Abby K. Horwitz, U.S. Army, St. Louis, MO, of counsel.

## OPINION

SMITH, Chief Judge:

This matter is before the court on plaintiff's Motion for Summary Judgment on the government's $49.5 million counterclaim. This case arises out of a series of contracts between the United States Army and plaintiff, the Sikorsky Aircraft Division of United Technologies Corporation (Sikorsky), for the design and manufacture of the UH–60A Black Hawk Helicopter. The government contends that Sikorsky's design for the helicopter's main rotor spindles [1] was defective. Plaintiff asserts that defendant cannot establish that the spindles were defective because the spindles have the requisite "fatigue" life under the contractually prescribed measurement methodology.[2] Alternatively, plaintiff contends that the government is not entitled to damages because the spindles were produced under manufacturing contracts according to the design qualified by defendant under the prior development contract. Upon full consideration of the parties' briefs, oral arguments, supporting documentation, and the caselaw, the court concludes that plaintiff must prevail on its motion.

## FACTS

On December 30, 1971, the government issued a Request for Proposals (RFP) for a cost reimbursement contract to design and develop the Black Hawk Helicopter. Under the RFP, the winning bidder was to prepare an airworthiness qualification specification, or "substantiation methodology", by which it could demonstrate compliance with the RFP's general specifications.[3]

The RFP required that certain components of the helicopter, including the spindles, have a fatigue life of 5,000 hours. In determining the spindles' fatigue life, two primary factors were considered: (1) the expected ground and flight conditions to which the spindle would be subjected during its life (the "usage spectrum"), and (2) the results of S–N testing, which involved the charting of stress (S) versus the number of cycles to failure (N). The RFP further specified that six specimens of each component be tested. After qualification testing was completed, the results were to be compiled and submitted in a report to the government.

The RFP also provided for a two-phase development contract. The first phase involved a 36 month period in which each contractor would design, develop, fabricate, test and qualify its prototype aircraft and aircraft system in accordance with the RFP's general specifications. The government was then allotted one year in which to competitively test the prototypes and select a contractor to manufacture the aircraft under subsequent production contracts. Pursuant to the development contract's maturity phase option [4], the selected contractor would continue any necessary development engineering, including fatigue testing, for 22 months prior to entering into the production contract.

On August 30, 1972, Sikorsky was awarded Development Contract DAAJ01–73–C–0006 on a cost reimbursement basis. The contract contained the standard inspection clause which limited plaintiff's liability for deficiencies discovered to six months after government acceptance. However, Sikorsky remained liable at any time for failure to comply with contract requirements, if such failure was (1) due to fraud, lack of good will or willful misconduct of

---

**1.** Spindles are the components which attach the four main rotor blades to the aircraft. Diagrams of the spindle and other critical components of the Black Hawk are contained in the appendix to this opinion.

**2.** The fatigue life is the period during which the specified component should not fail.

**3.** The RFP contained a government system specification which set forth specific requirements

and bands of performance from which the contractor was to prepare a Prime Item Development Specification (PIDS). The PIDS was to be a more detailed description of the helicopter establishing the design standards to be met on future production contracts.

**4.** Plaintiff's exhibit 1, RFP ¶¶ C.37j, E.1 0019.

plaintiff's officers, directors or key supervisory employees or (2) caused by an individual employee after any supervisory personnel had reasonable grounds to suspect such employee was habitually careless or unqualified.[5]

Sikorsky was responsible for the aircraft design only until the competitive stage of the development contract began. After that, the government assumed design responsibility.[6] In the PIDS established by plaintiff, the spindles were to have fatigue lives of 10,000 hours instead of the 5,000 contemplated by the RFP. The development contract required the spindles to meet the 10,000 hour fatigue life in accordance with the substantiation methodology established in Sikorsky Engineering Report ("SER")–70100, which set forth the S–N curve and usage spectrum plaintiff would apply in testing the spindles.[7] The government approved SER–70100 on November 18, 1977. Plaintiff contends that it fatigue tested six spindles and submitted SER–70116 to the government, substantiating that the spindles exceeded the 10,000 hour requirement. Plaintiff also asserts that it submitted SER–70116 to the government on April 9, 1980, and that defendant accepted the test results on July 22, 1980.[8]

Plaintiff was awarded the first Black Hawk production contract in 1977 during the maturity phase of the development contract.[9] This contract was on a fixed-price incentive fee basis with three one-year production options. The contract contained

two clauses which plaintiff contends are the only basis upon which the government can rely for recovery. The first required Sikorsky to correct any deficiencies discovered by either the government or plaintiff, but was limited in scope:

> This clause shall apply only to those deficiencies discovered by either the Government or the contractor within 24 months after acceptance of supplies or services called for during the first year production; within eighteen months after acceptance of the supplies or services called for during the second year (option) production; within twelve months after acceptance of the supplies or services called for during the third year (option) production; and within six months after acceptance of the supplies or services called for thereafter under this contract by the Government.[10]

"Deficiency" was defined as including design defects under any prior contract which were the responsibility of the contractor.

The second clause is the standard fixed price incentive supply contract inspection clause which provides:

> All supplies shall be subject to inspection and test by the Government ... [and] [i]n case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them ... or to require their correction. ...

---

**5.** Development Contract ¶ 1.5, Inspection and Correction of Defects Clause, ASPR 7–402.5(a)–(c) (May 1960), Plaintiff's Exhibit 10.

**6.** The Assumption of Design Control clause set forth the parties' design responsibilities:
Upon acceptance of the aircraft by the government ... the Government will assume configuration control and any Class I changes to the system proposed by the contractor shall be by Engineering Change Proposal (ECP).... The change will not be implemented prior to incorporation into the contract.
Development Contract ¶ J.23g, Plaintiff's Exhibit 11.

**7.** SER–70100 established the S–N curve and usage spectrum following Modification P00124 to the development contract.

**8.** The government contends that Sikorsky did not perform six valid tests and that the Army

was forced to rely upon plaintiff's representations in that regard. Plaintiff admits that it reported the results of only five of the six spindles tested, because the sixth broke during testing. Plaintiff asserts, however, that it informed the government of this result at the time it occurred. Defendant does not dispute that it accepted SER–70116 which provided the results of Sikorsky's fatigue tests on five specimens. Plaintiff's Exhibit 24 B–17 and B–18.

**9.** The first production contract was for the "102" spindle for 168 aircraft. An August 1981 modification provided for the production of a thicker "103" spindle for 764 aircraft.

**10.** Black Hawk Production Contract DAAJ01–77–C–0001, ¶ J.9b(2), Plaintiff's Exhibit 27.

Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.[11]

On August 13, 1981, during the fourth and last option year of the first production contract, the government issued Contract Modification P00357 which required Sikorsky to increase the spindles' diameter. This modification called for plaintiff to fatigue test four 103 spindles, but did not require Sikorsky to develop a new substantiation methodology. The modification also did not specify a different usage spectrum from the one contained in the first production contract PIDS. With the government's approval, however, plaintiff substantiated the new spindles using a new and more rigorous usage spectrum (the "MOD A" spectrum) and revised strength data. Sikorsky reported the results of its tests on the four 103 spindles to the government. Under the new substantiation methodology, the spindles had a fatigue life of 6,700 hours. The government accepted the spindles.

Sikorsky was awarded three production contracts and three Basic Ordering Agreements (BOAs) pursuant to which it supplied the remaining 103 spindles. The second contract was on a fixed price incentive fee basis, while the rest were awarded on a firm fixed price basis. None of the production contracts required plaintiff to redesign the spindles, redevelop the original methodology, or to submit any substantiation reports to the government. The contracts simply called for spindles with a 10,000 hour fatigue life under the original substantiation methodology. The BOAs did not specify the spindles' required fatigue life, nor did they call for any new designs, methodology, or reports. Moreover, unlike the first production contract, there was no provision in the subsequent production contracts or the BOAs imposing liability on Sikorsky for design defects when design was plaintiff's responsibility under a prior contract. However, the subsequent contracts and BOAs contained the standard inspection clause quoted above.

A Black Hawk helicopter crashed in April 1985, killing all on board. During its investigation, the government determined that a spindle had fractured on the helicopter. Sikorsky fatigue tested 31 spindles in the following year as part of its post crash investigation. Plaintiff provided those test results to the government in May 1986. The government contends that these results revealed that the 103 spindles did not actually have the required 10,000 hour fatigue life.

On March 21, 1989, the contracting officer issued a final decision finding Sikorsky liable for defective main rotor blade spindles and assessing damages in the amount of $49,503,966.00. On August 29, 1989, the contracting officer rejected Sikorsky's $6,994,794.00 claim for payment under the contracts on the basis of the alleged defect. On September 12, 1989, plaintiff filed its complaint in this court challenging both decisions. On October 10, 1989, the government filed its answer asserting a counterclaim based upon the allegedly defective spindles.

## DISCUSSION

Summary judgment is appropriate only where the pleadings raise no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). In this instance, Sikorsky bears the burden of establishing an absence of evidence to support the government's counterclaim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In opposing this motion, the United States has the burden of showing sufficient evidence of any genuine issue of material fact which would preclude the grant of summary judgment. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. For the reasons which follow, the court finds that

11. ASPR 7–103.5 (May 1958), Plaintiff's Exhibit 28.

plaintiff is entitled to summary judgment on defendant's counterclaim.

## I. THE LATENT DEFECT CLAIM

In order to recover on its latent defect claim, the government must first establish the existence of a defect. Plaintiff asserts that defendant cannot establish that the spindles were defectively designed because they had the required fatigue life under the contractually prescribed measurement methodology. Sikorsky contends that the government's arguments are based upon fatigue life testing that is not specified in any of the development or production contracts. Rather, plaintiff argues, the government's assertions rest on plaintiff's post-crash tests of 31 spindles. Those tests, Sikorsky notes, were not called for in the contracts and vary from the fatigue tests called for in the development contract.

In response, defendant argues that it can establish the defective nature of the spindles in either one of two ways. First, the government argues that the pre-crash data alone proves that the spindles were defective. Defendant points out that Sikorsky was contractually bound to carry out fatigue testing in accordance with its proposed methodology. Although the Army did not know it at the time, defendant asserts that plaintiff implemented its fatigue testing in a defective manner. Among other things, defendant alleges that Sikorsky: (1) failed to perform sufficient tests on the spindles to evaluate other failure modes; (2) failed to identify droop stop pounding [12] as the critical failure mode; (3) failed to identify the shank under the droop stop ring as the critical failure mode location; (4) failed to test the spindle for the shank failure; (5) did not use results from six specimens for the threads which plaintiff then asserted was the critical failure mode; and (6) failed to follow its own prescribed methodology in analyzing test results and correlating them with flight loads.

Second, the government argues that there is no basis for precluding consideration of plaintiff's post-crash test data to confirm the defective nature of the spindles. Defendant notes that plaintiff's tests on the 31 spindles strongly support the government's contention that the spindles were defective. The government also disputes Sikorsky's arguments that the post-crash testing was more stringent and therefore is barred from the court's consideration.

■ It is well-established government contract law that the contract specifications are the standard for determining defects. *E.g.*, 48 C.F.R. § 10.001, FAR § 10.-001 (" 'Specification' means a description of the technical requirements for a material, product, or service that includes the criteria for determining whether these requirements are met."); *see also W.C. Fore Trucking, Inc.*, ASBCA No. 32156, 89–2 BCA ¶ 21,869, 1989 WL 46971 (1989) (Contractor's satisfaction of contract's testing specifications is *prima facie* evidence of contract conformance.) Therefore, the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract. *Southwest Welding & Manufacturing Co. v. United States*, 188 Ct.Cl. 925, 951–53, 413 F.2d 1167, 1183–84 (1969); *see also SMS Data Products Group, Inc. v. United States*, 17 Cl.Ct. 1, 10 (1989). In the instant case, it is clear that plaintiff has established a *prima facie* case of contract compliance.

■ Fatigue lives are not independently fixed quantities, like length or mass, but vary depending on how the aircraft is used. Accordingly, the variables affecting fatigue life must also be fixed in the contract. In the instant case, the fatigue life was to be measured in accordance with a standardized methodology, which included development of a usage spectrum from a government flight profile, the use of standardized fatigue curve shapes, and numerous other factors. Once this was approved by the

---

12. Rotor blades droop under their own weight when at rest or rotating slowly. A droop stop is used to support the blades during these times to prevent them from contacting the tail end of the helicopter.

government, it became standard under all subsequent contracts. Employing this methodology, Sikorsky calculated the spindles' fatigue life at 10,400 hours. The government relies mainly upon Sikorsky's failure to take droop stop pounding into account to show that the methodology was defective in substance or implementation. However, droop stop pounding was not a critical condition included in the government's flight profile or the usage spectrum.[13] Thus, plaintiff was not required by the contract to take droop stop pounding into account in calculating the fatigue life. While this may have had tragic consequences, it does not establish a defect as the government cannot question its own specifications "after the fact and ... independently of the contract requirements." *Southwest Welding & Mfg. Co.*, 188 Ct.Cl. at 951, 413 F.2d at 1183; *see also Teton Constr. Co.*, ASBCA Nos. 27700, 28968, 86–2 BCA ¶ 18,973, 1986 WL 19925 (1986) (Government cannot rely on results from a test which differs from those required by the contract.)[14] Thus, in this case, it cannot shift responsibility from itself to the plaintiff.

■ The post-crash data submitted by Sikorsky may well confirm the government's opinion of the cause of the accident. However, this data was the result of testing conducted pursuant to the MOD A usage spectrum which included a droop stop pounding rate of 5 seconds per hour, whereas the contractual spectrum did not consider droop stop pounding at all. Thus, the government complains of an inaccurate fatigue life calculation which is the result of its own failure to impose a different and more stringent requirement upon plaintiff than that found in the contract. As a result, the post-crash data cannot be used to establish a defect.

■ However, even assuming the government could establish that the original substantiation methodology was defective, defendant would have to establish that the defect was latent. Sikorsky argues that the government cannot establish this because the methodology was known to, approved, and specified by defendant. This was part of the basis for qualifying the helicopter design. Specifically, plaintiff argues that the government accepted the spindles after August 1981, when defendant knew that the spindles did not have the requisite 10,000 hour fatigue life when measured by the more stringent MOD A substantiation methodology. In response, defendant argues that the standard in determining latency is whether the defects could be discovered by reasonable observation or inspection. The government contends that, based on plaintiff's representations, it could not have known about the defect. It ignores, however, the fact that it approved MOD A as well as the original substantiation methodology without droop stop pounding as a part of its own flight profile or usage spectrum.

■ A latent defect negates the effect of final acceptance under a contract. *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 488 F.2d 980 (1973). In order for the government to avoid the conclusive effect of final acceptance of the spindles,

> it must establish the existence of defects at the time of final acceptance which were hidden from knowledge as well as sight and could not be discovered by the exercise of reasonable care. It is further well established that defects which can

---

13. Defendant's Statement of Genuine Issues ¶ 33. A critical failure mode is where the component is most likely to fail in use. Defendant's Proposed Findings of Fact ¶ 47. Defendant contends that had Sikorsky included adequate droop stop pounding in the spindles' testing loads, the shank under the droop stop ring would have been established as the critical failure mode. However, the government does not dispute that the spindle threads are the critical failure mode when the contractual testing loads are applied.

14. To use a simple analogy, suppose Green Taxicab Company orders a car from Special Motors. Green requires that the car last 100,000 miles given a typical cab usage profile: 500 miles per day, driven no more than 35 miles per hour and with frequent stops. Special can produce a car tested for those conditions that lasts at least 100,000 miles. However, it cannot warrant that any such car will actually last 100,000 miles. Green will have to expect that other variables such as a driver's skill, weather, and maintenance will also affect the life of the car.

be discovered readily by an ordinary examination or test are not latent and a failure to make the examination or test does not make them so, the finality of acceptance is not diminished by such failure. *Polan Industries, Inc.*, ASBCA Nos. 3996 et al., 58–2 BCA ¶ 1982 [1958 WL 576]; *Hercules Engineering & Manufacturing Company*, ASBCA No. 4979, 59–2 BCA ¶ 2426 [1959 WL 625]. *Herley Industries, Inc.*, ASBCA 13727, 71–1 BCA ¶ 8888, 1971 WL 1434 (1971) at 41,309. A defect known to exist at the time of acceptance cannot be considered a latent defect. *Southwest Welding*, 188 Ct. Cl. at 956–57, 413 F.2d at 1186; *Gavco Corp.*, ASBCA Nos. 29763, 30935, 32708, 88–3 BCA ¶ 21,095 at 106, 501, 1988 WL 97215 (1988); *Hercules Engineering & Mfg. Co.* at 11,417. In the instant case, the alleged defect in the spindles was known to the government at the time of acceptance, thereby precluding defendant's latent defect claim.

The government admits that it accepted the 103 spindle after Sikorsky's March 4, 1981 report that the spindle had a 6,700 hour fatigue life when calculated with the MOD A spectrum and R2 curve shapes.[15] On August 13, 1981, the government issued Contract Modification P00357, which required Sikorsky to increase the spindles' diameter. The government subsequently approved plaintiff's use of the MOD A spectrum to substantiate the thicker spindle.[16] Thus, the government cannot claim that the alleged defect in the 3,344 spindles subsequently manufactured under the production contracts was "hidden from knowledge" or sight. The government could have required that those spindles be substantiated by testing a larger number of spindles with different variables. That it chose not to does not diminish the finality of acceptance. Nor can it shift responsibility to the plaintiff for the consequences. While the government could have bargained for the plaintiff to insure that the spindles had a fixed absolute fatigue life, it did not choose to do so. This may well be because that was not technologically feasi-

ble. However, the government cannot unilaterally impose such an obligation upon the plaintiff now.

Defendant may still have a latent defect claim as to the 444 spindles accepted prior to March 4, 1981. Latent defect disputes are often highly factual and difficult to resolve on summary judgment. *Southern Pipe and Supply Co.*, 71–1 BCA ¶ 8868, 1971 WL 1822 (NASA BCA 1971). However, the undisputed facts demonstrate that defendant's latent defect claim fails as to the spindles produced after March 4, 1981. Furthermore, as is explained below, the contracts at issue here provide no post-acceptance remedy for any alleged latent defects. Finally, defendant, as noted above, cannot even show that the earlier spindles were defective.

## II. THE CONTRACT RECOVERY ISSUE

Even if there were latent defects in the spindles or the substantiation methodology, defendant must establish that it has a basis for recovery in the various contracts between the government and Sikorsky. Plaintiff contends that the government has no post-acceptance right to recover for alleged design defects. In support of this assertion, plaintiff puts forth three arguments. First, plaintiff asserts that the cost reimbursement development contract contemplated post-acceptance remedies only in the case of willful misconduct which the government does not allege. Second, Sikorsky asserts that the fixed-price production contracts do not afford a remedy for defects in work performed on the development contract. Third, plaintiff alternatively contends that the production contracts afford no remedy for defects in performance of the development contract because the former were manufacturing contracts with no design requirements for the fatigue life methodology.

█ As an initial matter, the court finds that the cost-reimbursement development contract affords defendant no basis for relief. The development contract's Inspec-

---

**15.** Defendant's Proposed Findings of Uncontroverted Fact ¶ 19.

**16.** Plaintiff's Exhibit 44 (May 2, 1986 memo of Contracting Officer Robert E. Butler) at 1.

tion Clause required that plaintiff correct deficiencies at the government's expense within six months after acceptance, except in the case of willful misconduct.[17] This is a common arrangement, and is consistent with the allocation to the government of the risk of the cost of performance in a cost-reimbursement contract. As a general rule, the contractor is liable for latent defects under fixed-price contracts but not those awarded on a cost-reimbursement basis. The government assumes the risk of performance in the latter instance because the contractor receives only what it spends plus a previously determined fee. If the costs of performance are higher than estimated, the government must furnish additional funds or the contractor is excused from performance. Under such an arrangement, "it is extremely remote that the contractor would incur any liabilities for defective or untimely work." J. CIBINIC AND R. NASH, FORMATION OF GOVERNMENT CONTRACTS (2nd ed.) at 705. Such was the bargain struck in the instant case. The government cannot now complain of its assumption of the risk of latent defects under the development contract.

■ Because it cannot establish a basis for relief under the development contract, the government looks to the fixed-price production contracts and the BOAs to establish a basis for recovery. These contracts included the standard Inspection Clause which allows defendant to set aside final acceptance of delivered goods based upon "latent defects, fraud, or such gross mistakes as amount to fraud." Plaintiff argues that this clause applies only to latent manufacturing defects, not to the de-

sign deficiencies which defendant has alleged.[18] As the government can only recover for manufacturing defects under a manufacturing contract, defendant must show that the production contracts and the BOAs were effectively performance contracts. *See R.E.D.M. Corp. v. United States,* 192 Ct.Cl. 891, 428 F.2d 1304 (1970). Thus, the government argues that the production contracts and the BOAs are intermingled with the development contract, so that the development contract's 10,000 hour fatigue life requirement became a performance requirement of the latter contracts.

The government asserts that plaintiff knew that the successful contractor under the maturity phase of the development contract would be responsible for the manufacture of the Black Hawk and all of its components. Defendant argues that the Black Hawk development and manufacturing process was contemporaneous and integrated and, therefore, the bases of relief afforded by the development contract apply to the production contracts and BOAs as well. However, the fact that the first production contract was awarded during the maturity phase of the development contract does not establish that they were a unified agreement. On the contrary, the government could have awarded Sikorsky one contract but chose not to.[19] Instead, defendant awarded a cost-reimbursement contract for the design and development work, whose cost was unpredictable, and a separate fixed-price contract for production, which involved minimal risk for the government.[20] The court finds that the govern-

---

**17.** Plaintiff's Exhibit 10, Development Contract General Provisions L.5 *Inspection and Correction of Defects.*

**18.** This argument is bolstered by the language of the inspection clause itself, which provides for post-acceptance relief "in case any supplies … are defective in material or workmanship".

**19.** Defendant relies on *SCM Corp.,* ASBCA Nos. 26544, 26786, 26788, 26790–92, 85–1 BCA ¶ 17,-783, 1984 WL 13909 (1985), for the proposition that a contractor may be held liable for design defects in a two-phase design and production contract following an earlier design contract. However, in *SCM,* the Army awarded the design work under one contract, and then combined

the engineering phase with the initial production phase under a single fixed-price contract. Thus, unlike the instant case, the risk was allocated to the contractor.

**20.** The government also argues that it relied on Sikorsky's expertise in helicopter design in entering the contracts, and therefore plaintiff should bear the risk for design defects. Defendant cites several cases in which the contractors were held liable for design defects on the basis of representations of their expertise. *See, e.g., Austin Co. v. United States,* 161 Ct.Cl. 76, 314 F.2d 518, *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). However, those cases precluded the contractors from shifting the risk

ment cannot now with hindsight conclude that the development and production contracts were in effect one contractual relationship. The language, structure, and purpose of the contracts contradict this position.

Nor do the production contracts' 10,000 hour fatigue life requirement alter this conclusion.[21] The fatigue life, as explained above, was determined on the basis of a standardized methodology developed by Sikorsky and accepted by the government. The fact that the spindles did not have a 10,000 hour fatigue life under the MOD A methodology is irrelevant to those spindles substantiated under the original methodology. When the MOD A methodology was incorporated into the contract in 1988, the fatigue life was correspondingly lowered to 2,500 hours for the 102 spindles and 6,700 hours for the 103 spindles. Thus, based upon the plain reading of the contract, even if the production contracts are construed as performance contracts, Sikorsky complied with their fatigue life requirements.

for the cost of performance of fixed-price contracts to the government. There is no support for the imposition of liability on the contractor in a cost-reimbursement arrangement.

**21.** The BOAs are silent as to the fatigue life requirement. However, the government argues

## CONCLUSION

The court finds that the government cannot prevail on its counterclaim as a matter of law. Plaintiff has demonstrated that defendant cannot establish that the spindle or its substantiation methodology were defective. The spindles had the requisite fatigue life as measured by the contractual methodology developed by Sikorsky and accepted by the government. Moreover, the government knew that the spindles did not have a fatigue life of 10,000 hours as measured under more stringent standards. Thus, even assuming it could prove a defect, the government could not prove it was latent. In addition, assuming that the government could somehow establish the existence of material facts precluding summary judgment on its latent defect claim, defendant has no contractual basis of recovery. Accordingly, the court grants plaintiff's motion for summary judgment. A status conference will be held within 60 days to discuss further proceedings in this case. The conference will be held via telephone conference call to be initiated by the court.

that the 10,000 hour standard was implicit in the BOAs.

## APPENDIX

**Diagram 1 -- Propeller Hub**

**Diagram 2 -- Spindle**

Damper Attachment Lugs

Blade Attachment Lugs

Droop Stop Ring

Threads

Shank

Diagrams are not to scale