UNITED TECHNOLOGIES CORPO-
RATION, Sikorsky Aircraft Divi-
sion, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 401–89C.

United States Court of Federal Claims.

Aug. 15, 1994.

lief, and the relief sought, are disposed of in this opinion. Accordingly, these actions are consoli-

W. Jay DeVecchio, Washington, DC, with whom was Joan H. Moosally and W. Stanfield Johnson, of counsel, for plaintiff.

Cynthia D. Walicki–Chan, with whom was David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, and Stuart M. Gerson, Asst. Atty. Gen., for defendant. Major Mack Ives, U.S. Army, Washington, DC and Abby K. Horwitz, U.S. Army, St. Louis, MO, of counsel.

dated.

## OPINION

SMITH, Chief Judge.

This case comes before the court on defendant's Motion for Reconsideration of the court's December 18, 1992 opinion which granted plaintiff's motion for summary judgment. *United Technologies Corporation v. United States,* 27 Fed.Cl. 393 (1992). As this court stated in *Weaver–Bailey Contractors, Inc. v. United States,* 20 Cl.Ct. 158 (1990), "[a] motion for a new trial in a nonjury case or a petition for rehearing should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Id.* (citing 11 Wright & Miller, *Federal Practice and Procedure, Civil section 2804* ). Additionally, "[t]o the extent that the motion for reconsideration merely reasserts ... arguments previously made ..., all of which were carefully considered by the Court ... there is no reason to vacate the Court's earlier Opinion and Order." *Frito–Lay of Puerto Rico, Inc. v. Canas,* 92 F.R.D. 384, 390 (D.C.Puerto Rico 1981).

In its present motion, defendant claims that "genuine issues of material fact exist in this case which preclude a grant of summary judgment." Def's Br. filed January 5, 1993 at 1. Upon full consideration of defendant's arguments, the court finds that there is no manifest error of law or mistake of fact which would require a reconsideration of this court's previous opinion. Accordingly, and for the reason's set forth below, defendant's motion is denied.

## FACTS

A detailed description of the facts of the case appears in *United Technologies v. United States,* 27 Fed.Cl. 393 (1992). However, for the convenience of the reader, a brief recitation of the facts is presented below.

On December 30, 1971, the government issued a Request for Proposals (RFP) for a cost reimbursement contract to design and develop the Black Hawk helicopter. The RFP required that certain components of the helicopter, including the spindles which attached the four main rotor blades to the aircraft, have a fatigue life of 5,000 hours. In determining the fatigue life of the spindles, two primary factors were considered: (1) the expected ground and flight conditions to which the spindle would be subjected during its life (the "usage spectrum"), and (2) the results of S–N testing, which involved stress (S) versus the number of cycles to failure (N).

On August 30, 1972, plaintiff, United Technologies Corporation, Sikorsky Aircraft Division (Sikorsky), was awarded Development Contract DAAJ01–73–C–0006 on a cost reimbursement basis. Although the contract contained the standard inspection clause which limited plaintiff's liability for deficiencies to six months after government acceptance, Sikorsky remained liable at any time for failure to comply with contract requirements, if such failure was (1) due to fraud, lack of good will or willful misconduct or (2) caused by an individual employee after any supervisory personnel had reasonable grounds to suspect such employee was habitually careless or unqualified.

The development contract required the spindles to meet a 10,000 hour fatigue life in accordance with the substantiation methodology established in Sikorsky Engineering Report (SER)–70100, which set forth the S–N curve and usage spectrum plaintiff would apply in testing the spindles.[1] The government approved SER–70100 on November 18, 1977. Plaintiff contends that it fatigue tested six spindles and submitted SER–70116 to the government, substantiating that the spindles exceeded the 10,000 hour requirement. Plaintiff also asserts that the government accepted the test results on July 22, 1980.

Sikorsky was awarded the first Black Hawk production contract in 1977 during the maturity phase of the development contract. This contract was on a fixed-price incentive fee basis with three one-year production options. The contract contained two clauses upon which the government could rely for recovery. The first required Sikorsky to

---

1. The RFP, which contained the original requirement of a 5,000 hour fatigue life, required the contractor to prepare a Prime Item Development Specification (PIDS). It was this PIDS established by plaintiff which increased the required fatigue life of the spindle to 10,000 hours.

correct any deficiencies discovered by either the government or plaintiff. The second clause was the standard fixed price incentive supply contract inspection which provided that any material or workmanship not in conformity with the requirements of the contract is "defective."

On August 13, 1981, during the fourth and last option year of the first production contract, the government issued Contract Modification POO357 which required Sikorsky to increase the spindles' diameter. The modification called for plaintiff to fatigue test four spindles, but did not require Sikorsky to develop a new substantiation methodology. With the government's approval, plaintiff substantiated the new spindles using a new and more rigorous usage spectrum (the "MOD A" spectrum) and revised strength data. Under the new substantiation methodology, the new, thicker spindles had a fatigue life of 6,700 hours. The government accepted the spindles.

Sikorsky was awarded three production contracts and three Basic Ordering Agreements (BOAs) pursuant to which it supplied the remaining new, type 103 spindles. The contracts called for spindles with a 10,000 hour fatigue life under the original substantiation methodology. The BOAs did not specify the spindles' required fatigue life, nor did they call for any new designs, methodology, or reports. There was no provision in the subsequent production contracts or the BOAs imposing liability on Sikorsky for design defects when design was plaintiff's responsibility under a prior contract.

A Black Hawk helicopter crashed in April 1985, killing all on board. During the crash investigation, the government determined that a spindle had fractured on the helicopter. Sikorsky fatigue tested 31 spindles in the following year as part of its post crash investigation. The government contends that these results revealed that the type 103 spindles did not actually have the required 10,000 hour fatigue life.

On March 21, 1989, the contracting officer issued a final decision finding Sikorsky liable for defective main rotor blade spindles and assessing damages in the amount of $49,503,-966.00. On August 29, 1989, the contracting

officer rejected Sikorsky's $6,994,794.00 claim for payment under the contracts on the basis of the alleged defect. On September 12, 1989, plaintiff filed its complaint in this court challenging both decisions. On October 10, 1989, the government filed its answer asserting a counterclaim alleging the spindles were defective.

On December 18, 1992, this court granted plaintiff's motion for summary judgment on the government's counterclaim alleging a design defect. The court held that "the helicopter rotor spindles were not defective, and the contractor is generally liable for latent defects under fixed-price contracts, but not those awarded on a cost reimbursement basis." *United Technologies,* 27 Fed.Cl. at 393.

## DISCUSSION

In its previous decision, the court held that the helicopter rotor spindles had the requisite fatigue life as measured by the contractual methodology developed by Sikorsky and accepted by the government. There was no evidence or showing of any dispute of a material fact on this issue. In addition, the court held that assuming that the government could somehow establish the existence of material facts precluding summary judgment on its latent defect claim, defendant had no contractual basis for recovery.

The government makes three arguments as to why this court should reconsider its previous opinion: (1) genuine issues of material fact exist regarding whether the Black Hawk spindle was defective; (2) genuine issues of material fact exist regarding whether the alleged defect in the Black Hawk spindle was in fact latent; and, (3) the production contracts and Basic Ordering Agreements afford the government a contractual basis for recovery. These arguments are addressed below.

I. *Do genuine issues of material fact exist as to whether the Black Hawk spindles were defective.*

In its earlier opinion, the court concluded that the United States could not establish the existence of a defect in the Black Hawk spindle as the government could not impose a

more stringent standard for demonstrating compliance than that which is set forth in the contract. *Southwest Welding & Manufacturing Co. v. United States*, 188 Ct.Cl. 925, 951–53, 413 F.2d 1167, 1183–84 (1969). The court also determined that the government could not use post-crash data to establish the existence of a defect.

In the present motion before the court, the defendant contends that the court has misinterpreted the government's contentions with regard to the existence of a defect. The defendant asserts that Sikorsky's failure to properly implement its methodology caused the spindles to be defective in that they failed to meet the contractual fatigue life standard of at least 10,000 operating hours. Defendant states that the Army does not rely upon standards other than those set forth in the contracts to establish the existence of a defect in the spindle. Defendant contends that under the terms of the development contract, Sikorsky was required to develop a complete usage spectrum which would encompass all flight conditions that would occur during the types of missions outlined in the profile which could contribute significantly to the fatigue damage of helicopter components. Defendant further contends that had Sikorsky applied a complete usage spectrum that accorded sufficient weight to droop stop pounding, Sikorsky would not have been able to establish that the spindle had the requisite fatigue life. Furthermore, defendant maintains that droop stop pounding constituted a critical failure mode which Sikorsky was responsible for taking into account in calculating fatigue life.

However, defendant also asserts that, contrary to the court's finding in its opinion, the government does not rely mainly upon Sikorsky's failure to consider droop stop pounding to show that the methodology was defective. The government argues that pursuant to the production contracts, Sikorsky was also required to perform accurate fatigue (S–N) testing, which required the identification of the spindle's critical test loads, which naturally include sufficient testing of both axial and bending loads. Defendant contends that Sikorsky failed to perform accurate S–N testing by not adequately testing for the spindle's axial loads which were more critical than the bending loads. The government asserts that at the time Sikorsky submitted its substantiation reports to the Army, the Army had no basis to question Sikorsky's actions regarding the axial testing and that subsequent to the 1985 Black Hawk crash, the Army received accurate S–N testing data from Sikorsky which indicated that the fatigue life of the spindles was far less than 10,000 hours. It should be noted here that the government's position seems to be that Sikorsky was required to guarantee that the spindles had a fatigue life of 10,000 hours. This appears to be based on an error of logic. The 10,000 hour fatigue life specification was not an *objective* characteristic of the spindle; rather, it was a requirement that can only be understood with respect to a specific test methodology. The government has not shown the court any evidence that the original contract methodology did not yield a 10,000 hour fatigue life.

Defendant also contends that the court erred when it viewed the Army's acceptance of a reduced fatigue life as an acknowledgement of the existence of a defect. The government asserts that Sikorsky represented that the reduced fatigue life was a result of the Mod A usage spectrum. Defendant contends that the Army accepted Sikorsky's representation, and on that basis accepted the reduction in fatigue life. However, defendant contends that the reduced fatigue life was not the result of the Mod A spectrum and the changes made by the Army to the helicopter's mission profile. Defendant maintains that the Army approved and accepted the reduced fatigue life of 6,700 hours, only based upon Sikorsky's representations that the reduction was due to the modified mission profile. Defendant contends that had the Army been aware of the fact that the Mod A usage spectrum had no effect upon the spindle's fatigue life, the Army would not have accepted the spindle with less than 10,000 hours without seeking an equitable adjustment from Sikorsky. In conclusion, defendant maintains that the spindles produced by Sikorsky have a substantially reduced fatigue life from that required by the original contract and are therefore defective.

■ Although the government contends that it is not imposing a more stringent standard than that which is set forth in the contract, the court finds otherwise. The actual specifications of a contract serve as the standard by which defects are to be determined. In the instant case, the standardized methodology utilized by Sikorsky to measure the fatigue life of the rotor spindles was presented to and approved by the government. Once accepted, the methodology became a requirement for all subsequent contracts. Thus, defendant is attempting to impose a more stringent standard than that required by the contract when the defendant asserts that the methodology employed by Sikorsky is defective. Having already approved Sikorsky's methodology, the government is estopped from questioning the specifications "after the fact and ... independent of the contract requirements." *Southwest Welding & Mfg. Co.,* 188 Ct.Cl. at 951, 413 F.2d at 1183.

Secondly, the court holds that the government may not use post-crash data in order to establish the existence of a defect as the post-crash data resulted from testing conducted under the Mod A usage spectrum which imposed a more stringent standard upon Sikorsky than that required by the contract. The alleged deficiency in the fatigue life methodology is solely the result of the government's failure to impose more stringent contract requirements. Thus, the government may not use the post-crash data to establish a defect.

II. *Do genuine issues of material fact exist as to whether the alleged defect in the Black Hawk spindle was latent.*

■ In its second argument, the government contends that genuine issues of material fact exist regarding whether the defect in the Black Hawk spindle was latent. Of course, the court has found that there was no defect under the contract's required methodology. However, assuming there was a defect, the court addresses this contention. The existence of a latent defect negates the effect of final acceptance under a contract. *Kaminer Constr. Corp. v. United States,* 203 Ct.Cl. 182, 488 F.2d 980 (1973). The govern-

ment contends that Sikorsky's failure to properly implement its substantiation methodology caused the spindles to be defective and that such a defect could not reasonably have been discovered by the Army by observation or inspection made with ordinary care. The government also claims that the contract required Sikorsky to test for fatigue life, and the Army was entitled to rely upon Sikorsky's expertise in this area.

The government further contends that the Army's acceptance of the reduced fatigue life is unrelated to the failure of Sikorsky to correctly implement its substantiation methodology. The Army only accepted the reduction in fatigue life based upon Sikorsky's representation that the reduction was a result of the changes in usage imposed by the Army. The government contends that the reduced fatigue life was not an indication that the spindle was flawed but merely the result of a change in the usage of the aircraft and consequently provided no notice to the Army that a defect existed.

■ The court recognizes that a latent defect negates the effect of final acceptance under a contract. *Kaminer Constr. Corp. v. United States,* 203 Ct.Cl. 182, 488 F.2d 980 (1973). However, a defect known to exist at the time of acceptance cannot be considered a latent defect. *Southwest Welding & Mfg. Co.,* 188 Ct.Cl. at 951, 413 F.2d at 1183. In the instant case, the alleged defect was in fact known to the government at the time of acceptance. The government admits that it accepted the type 103 spindle after Sikorsky's March 4, 1981 report that the spindle had a 6,700 hour fatigue life when calculated with the MOD A spectrum. On August 13, 1981, the government issued Contract Modification POO357, which required Sikorsky to increase the diameter of the spindles, for which the government approved plaintiff's use of the MOD A spectrum. Thus the government cannot claim that the 3,344 spindles subsequently manufactured under the production contracts were hidden from knowledge or sight. The court recognizes that the government may maintain a latent defect claim as to the 444 spindles accepted prior to March 4, 1981. However, such a claim fails as defendant, for the reasons not-

ed above, cannot even demonstrate that the earlier spindles were in fact defective.

### III. Do the production contracts and BOAs afford the government a contractual basis for recovery.

■ In its third argument, the government asserts that the production contracts and BOAs afford the United States a contractual basis for recovery. The government contends that it is evident from the contractual relationship between Sikorsky and the Army, as well as from the language of the contracts themselves, that the parties intended to bind themselves to an agreement that required Sikorsky to produce a spindle with a fatigue life of 10,000 operating hours. The government also contends that to hold that the United States is not entitled to recovery for a latent defect is to, in effect, read the provision requiring a 10,000 hour spindle out of the contracts. The government contends that contrary to the court's analysis, the fact that the same contractor was responsible for both the design and production of the aircraft places this case in a different posture than cases in which separate contractors have been awarded design and production contracts. The government asserts that the alleged latent defect arose out of Sikorsky's performance during and contemporaneous with the production contracts for which the United States should be entitled to recover.

■ The court finds that the government is not entitled to recovery under the cost-reimbursement development contract. The court recognizes the general rule that the contractor is liable for latent defects under fixed-price contracts but not those awarded on a cost-reimbursement basis. The fixed-price production contracts and the BOAs do not provide a basis for recovery. These contracts included the standard Inspection Clause which allows defendant to set aside final acceptance of delivered goods based upon "latent defects, fraud, or such gross mistakes as amount to fraud." This clause applies only to latent manufacturing defects, which are not even alleged here, not to design defects. Because the government can only recover for manufacturing defects under a manufacturing contract, defendant must show that the production contracts and the BOAs were effectively performance contracts. See R.E.D.M. Corp. v. United States, 192 Ct.Cl. 891, 428 F.2d 1304 (1970). Thus the government argues that the production contracts and the BOAs are intermingled with the development contract, so that the development contract's 10,000 hour fatigue life requirement became a performance requirement of the latter contracts.

The court finds that the language, purpose, and structure of the contracts contradict the government's assertion that the development and production contracts were in effect one contractual relationship. The government argues that the Black Hawk development and manufacturing process was so integrated that, therefore, the basis for relief afforded by the development contract applies to the production contract and the BOAs as well. The fact that the first production contract was awarded during the maturity phase of the development contract does not establish that they were a unified agreement. This is evidenced by the fact that the government could have awarded Sikorsky a single contract governing both production and development but chose not to do so. The court would have to ignore the very structure of the parties' relationship, established at the behest of the government, to now accept the government's argument. The government is really asking the court to rewrite the contract in its favor. This the court cannot do.

In addition, even if the production contracts are construed as performance contracts, Sikorsky complied with the 10,000 hour fatigue life requirement. The fact that the spindles did not have the 10,000 hour fatigue life under the MOD A methodology is irrelevant to those spindles substantiated under the original methodology. Once the MOD A methodology was incorporated into the contract in 1988, the fatigue life was correspondingly lowered to 2,500 hours for the type 102 spindles and 6,700 hours for the type 103 spindles. Thus, Sikorsky complied with the fatigue life requirements.

### CONCLUSION

The court finds that genuine issues of material fact do not exist regarding whether the

Black Hawk spindle was defective or whether in fact the alleged defect in the spindle was latent. In addition, the court finds that neither the production contract nor the Basic Ordering Agreements afford the United States a contractual basis for recovery. Thus, plaintiff is entitled to summary judgement on the government's counterclaim alleging a design defect. Defendant's motion for reconsideration is denied.

The parties shall file a joint status report within sixty days setting forth their proposals for further proceedings.

IT IS SO ORDERED.